[Cite as *State v. Thompson*, 2021-Ohio-376.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                      :

    Plaintiff-Appellee,                        :

                         No. 109253

    v.                                                 :

WIMBERLY THOMPSON,                                  :

    Defendant-Appellant.                       :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 11, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-634365-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and James Gallagher, Assistant Prosecuting Attorney, *for appellee.*

J. Charles Ruiz-Bueno, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Wimberly Thompson ("Thompson") appeals his convictions for felonious assault, aggravated vehicular assault, violating a protection order, and operating a vehicle while under the influence, as well as his 11-year prison term.

After reviewing the facts of the case and pertinent law, we affirm the trial court's judgment based on the overwhelming evidence in the record supporting Thompson's guilt.

## I. Facts and Procedural History

{¶ 2} This case involves significant injuries sustained by the victim, D.Q., when she was thrown off the hood of Thompson's car on the night of November 4, 2018. That evening, Thompson ran his vehicle into a fire hydrant and a tree, pulling the hydrant out of the ground and disabling the car. D.Q.'s injuries, sustained when she hit the pavement, include brain damage and a broken pelvis.

{¶ 3} On November 14, 2018, Thompson was indicted for two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), two counts of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) and (A)(2)(b), violating a protection order in violation of R.C. 2919.27(A)(1), and operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a). On October 7, 2019, the case proceeded to a jury trial with Thompson representing himself pro se. On October 10, 2019, the jury found Thompson guilty as charged.

{¶ 4} On October 17, 2019, the court held a sentencing hearing and merged the felonious assault and aggravated vehicular assault counts into one felonious assault conviction. The court sentenced Thompson to eight years in prison for this second-degree felony conviction, three years in prison for violating a protection order, and "six days" for operating a vehicle under the influence. The court ordered

the 8-year and 3-year prison terms to be served consecutively for a total sentence of 11 years in prison.

{¶ 5} The parties presented the following testimony and evidence pertinent to this appeal at Thompson's jury trial.

{¶ 6} Kevin Dominic ("Dominic") testified that he is a paramedic for the City of Cleveland, Division of EMS. Dominic was working the night shift on November 4, 2018, when he responded to a motor vehicle accident call on Erin Avenue in Cleveland. According to Dominic, the victim, later identified as D.Q., was laying in the middle of the street, breathing, but not speaking or moving. The vehicle, later identified as Thompson's Malibu, was "heavily damaged." Dominic testified that it was a "[p]retty frantic scene. A lot of people around. There was a fire hydrant that was significantly displaced. Also looks like car parts in the middle of the street." According to Dominic, D.Q. was in a "critical state" with a "serious head injury," and he transported her to MetroHealth Medical Center ("MetroHealth").

{¶ 7} T.Q. testified that she is D.Q.'s mother. On November 5, 2018, T.Q. received a call from MetroHealth that D.Q. "was in a bad car accident, that she was intubated, [and that] she had a lot of frontal lobe damage and swelling on the brain." D.Q. was in a medically induced coma for approximately one to one-and-a-half weeks before she could breathe on her own. She did not recognize T.Q. until "maybe six, seven weeks after" the incident. D.Q. was incontinent, unable to walk, and unable to eat solid foods. "At that point she was like my two-year-old again. She

had to learn how to walk, she had to learn how to — we had to get her back talking. She couldn't shower herself. She was non-weight bearing. She was wearing briefs, we had to change her. I mean, you name it, she was back to infantile at that time." D.Q. was 18 years old at the time she sustained these injuries.

{¶ 8} D.Q. went from MetroHealth's intensive care unit, to a rehabilitation facility, and to a nursing home, before being released into her mother's care in March 2019. At the time of trial, D.Q. was still in therapy and had a home health aide that assisted her Monday through Friday from 7:00 a.m. to 3:00 p.m.

{¶ 9} D.Q. testified that she met Thompson in the summer of 2018, and he is her ex-boyfriend. Their relationship involved "a lot of fighting, arguing, and just back and forth." On the night of November 4, 2018, D.Q. "met up" with Thompson. They were sitting in his car when they started arguing. D.Q. testified that Thompson "started driving towards the west side," and she noticed that there was alcohol in the car. D.Q. testified as follows about what happened next: "So I grabbed the liquor once he stopped the car and put it in park, I grabbed the liquor bottle, poured it out and I broke the glass. And I got on top of the car and started arguing more and louder." D.Q. does not remember what happened after that. "The next thing I remember is I started having therapy." D.Q. testified that the injuries she sustained that night included "traumatic frontal lobe damage, brain injuries."

{¶ 10} City of Cleveland Police Officer Joseph Matt ("Officer Matt") testified that he and his partner responded to a call regarding a car crash on Erin Avenue on the night of November 4, 2018. He was wearing a body camera at the time, and the

state introduced the video footage from this camera into evidence at Thompson's trial. Officer Matt testified that when he arrived on scene, D.Q. was "laying on the ground at the feet of the officers" who were already there, "at least three houses to the east of where the car was" found.

{¶ 11} Officer Matt testified that Thompson exhibited "a strong odor of alcohol and slurred speech." Officer Matt administered the standard field sobriety tests to Thompson. Thompson missed various parts of the tests, and the officer "observed clues" indicating Thompson's impairment, such as swaying, not counting out loud, stepping off the line, and not touching his heel-to-toe. Officer Matt arrested Thompson for operating a vehicle under the influence and transported him to jail. Thompson refused to sign a form authorizing a blood, urine, or breathalyzer test, which would have indicated the alcohol or drug content in his system.

{¶ 12} Cleveland Police Officer David Cornett ("Officer Cornett") testified that he works in the accident investigation unit, and he responded to the crash on Erin Avenue on the night of November 4, 2018. When he arrived, the street was flooded "because of the fire hydrant," and Thompson's car was "positioned near a tree." Officer Cornett took pictures and measurements from the scene, so he could "put it in somewhat of a scale drawing." This drawing was introduced into evidence at Thompson's trial.

{¶ 13} Officer Cornett testified that, based on "interviews [he] did on scene and what [he] observed with [his] own eyes," the following is his understanding of what occurred that evening:

At this point the vehicle is traveling down Erin. * * * This is the vehicle coming westbound with supposedly the young lady on the vehicle hood. Continuing the progression at this point is where the blood is on the ground, so that's where they found her. As the vehicle continues, now it started to come in toward that curb, actually goes up to the curb, hits the fire hydrant, continues to spin around off of the fire hydrant and then impacts the tree, comes to final rest.

{¶ 14} Officer Cornett testified that the vehicle was "fishtailing. * * * So as he's coming in, now the back end is starting to kick out and he's starting to lose control and spin around." Additionally, Thompson's vehicle sustained "pretty significant damage all the way around" as a result of the incident at issue in this case, including "severe back end damage."

{¶ 15} Officer Cornett testified that hitting the fire hydrant caused "enough damage to basically disable the front axle assembly" of the vehicle, "which is pretty significant." According to Officer Cornett, the speed limit is 25 m.p.h. at site of the crash, and "I know on an impact like that you're not doing 25 miles an hour."

{¶ 16} Fern Gutwein ("Gutwein"), who lives at 2705 Erin Avenue, testified as follows about what happened outside of her house on the night of November 4, 2018:

I was out in my driveway and I heard yelling, and I went out to the front and I saw a car, like, across the street. * * * I seen a woman standing by the car and then she was on the hood. [There was] a person in the driver's seat. And he put the car in reverse and took off down the street like really, really fast. * * * She was on the hood holding on the hood of it screaming. And then a short time later I heard a boom and it just scared me really bad, because I knew she was on the front of the car.

{¶ 17} Asked how she could tell the car travelled in reverse, Gutwein testified, "I was standing there. And the car backed up and then went forward,

because there was a car in front, so it couldn't just go straight." According to Gutwein, after the car backed up, the driver "took off very fast" when D.Q., who was screaming, "was still on the hood of the car." Gutwein testified that D.Q. was "[l]aying like this (indicating) with her legs out."

{¶ 18} On cross-examination, Thompson, who represented himself at trial, asked Gutwein, "How fast is really fast, 10, 20 miles per hour, 30 miles per hour?" Gutwein replied, "I'd say like 70."

{¶ 19} Cleveland Police Detective Charles Moten ("Det. Moten") testified that he has been a police officer for 19 years, and he has been assigned to the accident investigation unit for ten years. Det. Moten has had "extensive" specialized training as an "accident reconstructionist."

{¶ 20} As part of the investigation in this case, Det. Moten got a search warrant to retrieve data from Thompson's vehicle after the November 4, 2018 crash. According to Det. Moten, "most vehicles contain an air bag control module and it has pre-crash data in it. It's recording five seconds, sometimes up to 20 seconds what a car is doing before a crash occurs. As soon as an event occurs, it saves that data. So I was able to attach our computer to that car and retrieve the data from the vehicle."

{¶ 21} Det. Moten testified that data gets saved only if there is "a change in velocity. If a vehicle strikes something, if there's a sudden change of velocity, it's going to save that data, especially if the air bags go off, it's definitely going to save it. It will save data if it's a non-air bag deployment event. It knows that something

happened, it wakes up, records it, but it might not make the air bags go off." As to how this data is interpreted, Det. Moten testified that "[t]he computer pulls [the data] and makes it into a report and tells me what occurred." To read this report, Det. Moten underwent "Crash Data Retrieval Training. It's a total of 40 hours to get the certification. I took that back in 2009. And with the update in cars, the newer cars, the more data it gives, so I went back in 2015 and got some additional training, another eight-hour training course."

{¶ 22} Det. Moten testified about the crash data retrieval report ("the Report") generated from the airbag control module ("the Module") in Thompson's car on November 4, 2018. The Report contained data from a five-second interval prior to when the vehicle came into contact with the fire hydrant and indicated that "[t]here was never any braking." In other words, Det. Moten testified, Thompson never pressed the brake pedal before impact. The report also indicated that, at five seconds before the crash, Thompson's vehicle was travelling at 64 m.p.h. and the "throttle," or how hard the gas pedal is being pushed, was at 96 percent or "[a]lmost full throttle." According to Det. Moten, the RPMs, or "how fast the motor is churning," registered 5,312, which is "a high number."

{¶ 23} At four seconds before the crash, the vehicle's speed was 66 m.p.h., the throttle was at 96 percent, and the RPMs registered 5,504. At three seconds before the crash, the speed was 78 m.p.h., the throttle was at 96 percent, and the RPMs were 5,760. At two seconds before the crash, the speed was 68 m.p.h., the throttle went down to zero, and the RPMs went down to 3,264. Det. Moten testified

that this information "tells me that for some reason they came off of the gas pedal" at two seconds before impact. At one second before the crash, the speed was 59 m.p.h., the throttle zero, and the RPMs 2,624, indicating that the gas pedal was not being pushed.

{¶ 24} Det. Moten summarized that "the operator of this vehicle was driving very fast and a couple of seconds before that crash something made them come off of the gas pedal [but the] brake was never applied." He further testified that when D.Q. "came off" the hood of Thompson's car, the vehicle was traveling "between 64 and probably 68 miles per hour."

{¶ 25} Thompson testified on his own behalf as follows:

Her and I that evening, we was coming through downtown Cleveland, and we was having a discussion about intellectual media property rights, movies, songs, poetry, books, literally those things.

* * * We was having a lot of fun.

* * * [W]e get to the west side of Cleveland, we get over to where Tremont is at, somewhere I know, so we can get something to eat. We were both intoxicated. I'm not going to continue driving on an empty stomach, and she has been drinking and I had been drinking.

* * *

Okay. So we're at the corner of 32nd and Erin and I asked [D.Q.] to step outside of the vehicle.

* * *

[S]he's standing there and she's talking to me outside of the vehicle, and * * * I asked her — there was this Casablanca moment * * * this movie magic moment. I asked her, Well, do you want to make this movie magic? We really are trying to make this movie. * * * So I asked her, Do you really want to do this? She said yes.

* * *

I asked her does she want to do this.  I put my vehicle in reverse, then I go and drive, and she latches on top of the hood.  So we're driving down Erin, * * * and we're driving down the street and immediately she falls off.  I gun it to get to turn around and I yanked the car around.

**{¶ 26}** Thompson further testified that when the police arrived on scene, he told the officers that D.Q. "yanked on my steering wheel.  The reason why I told them that she yanked on my steering wheel * * * is because it's something that she's done before, because I believed that they would never believe me when I said, Hey, look, we were trying to do this movie."  Thompson summed up the incident as follows: "That's what ended up happening that night.  There is nothing else that happened that night.  I did not try any category of assaults against her, ever, at all.  I was mishandling my vehicle.  I was mishandling my vehicle with my girl, doing something drunk, period."

**{¶ 27}** On cross-examination, Thompson testified that he was driving his car with D.Q. on the hood "for a few seconds."  Thompson also testified that he was driving "[a]pproximately, 15 to 25 miles per hour" at the time of the incident.  He further testified as follows:

Do know, I was drinking.  Do know that.  Do know that I was operating my vehicle while I had alcohol in my system.  I drink scotch.  * * * I know that when she got up there I was not gunning that vehicle.  We were playing — pardon me.

The rest of the story is that, yes, I was sitting in that vehicle and I was looking at her * * * like, yes, this is the Casablanca moment that I wanted to have.  This is actually what I wanted to have.  But that was during the intoxication.  So was I mishandling that vehicle?  Yes.  I was

doing something stupid.  And just like that stupid Casablanca moment, she ended up getting injured, and I hate myself for it.

## II.  Law and Analysis

{¶ 28} This matter comes before the court on Thompson's appellate brief, which contains 11 assignments of error, each of which is addressed below.  We address the assignments of error out of order for ease of discussion.

### A.  Admissible Evidence

### 1.  Crash Data Report

{¶ 29} In his first assignment of error, Thompson argues that the trial court abused its discretion by admitting the Report into evidence.

{¶ 30} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987).  Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 403(A).

{¶ 31} Furthermore, Evid.R. 901 requires that documents be properly authenticated "as a condition precedent to admissibility."  This is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.*  "The 'threshold requirement for authentication of evidence is low * * *."' *State v. Horton*, 8th Dist. Cuyahoga No. 101100, 2015-Ohio-99, ¶ 19,

quoting *State v. Freeze*, 12th Dist. Butler No. CA20011-11-209, 2012-Ohio-5840, ¶ 65. "Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of [the] defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶ 32} Thompson's argument that the Report was inadmissible is threefold. First, he argues that "it was not established that [the Report] was * * * from * * * Thompson's vehicle." Second, he argues that the state did not establish "whether the device was activated by either the striking of the fire hydrant or the tree." Third, he argues that the report "is not a document subject to any exclusions of the hearsay rule under" Evid.R. 803.

{¶ 33} As to Thompson's first argument, upon review of the trial transcript, we find that the state established that the Report came from Thompson's vehicle. Det. Moten testified that he "pulled data" from "a Chevrolet Malibu, the year was 2006 * * *." Det. Moten next identified that Thompson owned the Malibu in question. The following colloquy took place explaining how the data from Thompson's vehicle ended up in the Report:

Q: And how is this data presented to you by the computer?

A: It's just in a report form.

* * *

Q:  Was a report generated in this case?

A:  Yes.

Q:  If you saw that report, do you think you'd recognize it?

A:  Yes.

* * *

Q:  I'm handing you what's been marked as State's Exhibit 72.  Do you recognize that?

A:  Yes.

Q:  And can you explain to the jury what that is.

A:  This is a Bosch report.  It's called a CDR, Crash Data Retrieval report.  It gives all the information that the car was doing at the time of the accident or prior to the accident.

{¶ 34} Det. Moten identified data in the Report taken from Thompson's Malibu in relation to the diagram Officer Cornett drew and the pictures he took at the scene of the incident in this case.  Therefore, we reject Thompson's first argument regarding the admissibility of the Report.

{¶ 35} Turning to Thompson's second argument addressing the admissibility of the Report, we find that the state presented undisputed evidence that the device was triggered when Thompson struck the fire hydrant.  Det. Moten testified that an "event" triggered the recording of data from which the report was generated.  Asked what the event was, Det. Moten testified, "When the vehicle made contact with the fire hydrant."  Despite Thompson disputing in his appellate brief what object his car hit first, there was simply no evidence at trial that anything other

than the fire hydrant was hit first.  Thus, the foregoing evidence is sufficient to establish when the device was triggered.

{¶ 36} We turn to Thompson's third argument, namely that the Report was inadmissible hearsay.  Thompson cites no case law to support this argument, and both parties argue that this is an issue of first impression for this court.  Upon review, this court finds that Thompson's argument is without merit.

{¶ 37} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion," and a "'declarant' is a person who makes a statement."  Evid.R. 801(A) and (B). Generally, hearsay is inadmissible at trial.  Evid.R. 802.

{¶ 38} The Report is a computer-generated data compilation.  Specifically, the Module recorded and saved data in Thompson's Malibu from five seconds before impact to the time of impact with the fire hydrant on November 4, 2018.  Det. Moten retrieved the data from the Module in Thompson's vehicle pursuant to a search warrant and printed the Report on November 7, 2018.

{¶ 39} The information contained in the Report is not hearsay because the Report does not consist of "statements" made by a "person" as contemplated by the Rules of Evidence.  As this court recently held, "[t]here is no 'statement' for hearsay purposes where a witness does not testify about 'what someone else said, wrote, or

did.'" *State v. Wingfield*, 8th Dist. Cuyahoga No. 107196, 2019-Ohio-1644, ¶ 32, quoting *State v. Maiolo*, 2d Dist. Clark No. 2015-CA-15, 2015-Ohio-4788, ¶ 14.

{¶ 40} In *Gray v. Fairview Gen. Hosp.*, 8th Dist. Cuyahoga No. 82318, 2004-Ohio-1244, ¶ 8-12, this court held that information generated by "computer aided detection ("CAD") in mammography" was not inadmissible hearsay.

> [T]he CAD device is not a *person*. The results were not the consequence of a search of database of information created by a person, the accuracy of which would depend upon the accuracy and completeness of the database. * * * Rather, the result was a scientific analysis conducted by a computer which performed a series of complex mathematical calculations based upon detailed information it drew from an x-ray. Therefore, we do not find the computer analysis to be hearsay.

(Emphasis sic.) *Id.* at ¶ 11.

{¶ 41} Additionally, in *Dickerson v. Miller's TLC, Inc.*, 8th Dist. Cuyahoga No. 96995, 2012-Ohio-2493, ¶ 12-13, this court held that "testimony relating to information [the witness] received from the Google Maps application on his cell phone was not hearsay."

> By its very nature, calculation of distance, or of weight, volume, speed, and the like, is impossible without the use of a tool that has been calibrated to show a relevant unit of measure, e.g. a ruler, a tape measure, a wheel, a scale, or, at a more sophisticated level, a radar gun, a breathalyzer, or a blood test. When employed to measure something, none of those tools makes a "statement." *See Commonwealth v. Whitlock*, 74 Mass.App.Ct. 320, 936 N.E.2d 995 (2009). Instead, the only "statement" is the testimony of a witness about observations of distance, speed, weight, percentage, or volume he made as a result of using the tool. *Id.*

*Dickerson* at ¶ 13. *See also State v. Kandutsch,* 2011 WI 78, ¶ 66, 336 Wis.2d 478 (WI.2011) ("a computer-generated report is not hearsay when it is simply the result

of an automated process free from human input or intervention"); *People v. Rodriguez*, 16 Cal.App.5th 355, 381, 224 Cal.Rptr.3d 295 (2017) ("The computer-generated report of the GPS data generated by defendant's ankle monitor did not consist of statements of a person as defined by the Evidence Code, and did not constitute hearsay as statutorily defined"); *State v. Stuebe*, 467 P.3d 252, 256, (Ariz.App.2020) ("'machine-produced'" statements "were not made by a 'person' and are not hearsay"); *People v. Hamilton*, 2019 COA 101, 452 P.3d 184, ¶ 24 (Colo.App.2019) ("Reports would not be hearsay if a machine generated them automatically * * * because no 'person' or 'declarant' made a communicative 'statement' within the meaning of [Evid.R.] 801").[1]

{¶ 42} The historic purpose behind the rule against hearsay is "to exclude statements of dubious reliability that cannot be tested by cross-examination." *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2123, 767 N.E.2d 216, ¶ 70. In holding that the computer-generated Report does not constitute hearsay, we adhere to this well-established principle. It is axiomatic, at least at this point in time, that a computer cannot be cross-examined.

---

[1] The general notion that "computer-generated" data is legally distinct from "computer-stored" data can be traced back to the early days of mainstream computer use, led by the Louisiana Supreme Court in *State v. Armstead*, 432 So.2d 837 (May 23, 1983). Computer-stored data "represents only the by-product of a machine operations which uses for its input 'statements' entered into the machine by out of court declarants." *Id.* at 839. Computer-generated data is produced "solely by the electrical and mechanical operations of the computer * * * equipment, and was not dependent upon the observations and reporting of a human declarant." *Id.* at 840. "The printout of the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. Nor can we say that this printout itself is a 'statement' constituting hearsay evidence." *Id.*

{¶ 43} This is not to say, however, that computer-generated reports cannot be subjected to some level of scrutiny within the justice system. As discussed earlier in this opinion, evidence must be relevant, not unfairly prejudicial, and authenticated to be admissible. *See United States v. Washington*, 498 F.3d 225, 231 (4th Cir.2007) ("Any concerns about the reliability of such machine-generated information is addressed through the process of authentication not by hearsay * * * analysis.").

{¶ 44} Upon review of Det. Moten's testimony, we find that he authenticated the report in question and presented undisputed testimony regarding its reliability. *See State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 38 ("the culling and configuration of cell-phone records does not require the undertaking of a scientific process or an interpretation of results from experimentation. It reflects only a formatting of information that already exists as a part of the company's day-to-day business"). In the instant case, Det. Moten testified as follows on cross-examination:

Q: Now, when you was getting this information as far as the black box is concerned, now, there are things that can throw the data off, correct?

A: Not to my knowledge.

Q: Not to your knowledge?

A: No.

* * *

Q: Even malfunction of the device itself?

A:  No.

Q:  What about the car make and model, could you tell us whether or not the car make and model, was there any type of recalls done to that type of make or model or the black box system?

A:  I've never seen a recall to a black box system.

* * *

Q:  There's nothing that you've seen that would say anything that was inconsistent with the investigation report, right?

A:  No.

Q:  Nothing at all?

A:  No.

{¶ 45} In summary, under the specific facts of the instant case, the Report is admissible evidence because it is relevant, reliable, and authenticated, and it is not unfairly prejudicial, nor is it hearsay.  Accordingly, the trial court did not abuse its discretion by admitting the Report into evidence at Thompson's trial, and his first assignment or error is overruled.

## 2.  Body Camera Video

{¶ 46} In his sixth assignment of error, Thompson argues that the trial court abused its discretion by not allowing him "to introduce video footage from several police officers * * *."  Thompson does not identify in his appellate brief where in the transcript he believes this error occurred.  *See* App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * *.").

Nonetheless, we address this assignment of error on the merits and uphold the trial court's decision.

{¶ 47} During Thompson's cross-examination of Officer Matt, Thompson attempted to introduce as an exhibit "somebody's body camera." The following colloquy ensued:

Q: Is there any possible way that you can establish whose body camera that is?

A: I don't know.

Q: You do not know.

THE COURT: Is it your body camera?

THE WITNESS: It is not my body camera.

THE COURT: Thank you.

Q: Do you know if you would be in this video?

A: I don't know if I'll be in the video.

THE DEFENDANT: Actually, Your Honor, I'm not going to show this portion of the video. If it's possible, I can continue with cross-examination of the officer.

THE COURT: That's fine.

THE DEFENDANT: Thank you.

{¶ 48} After the parties rested their respective cases, but before jury instructions and closing arguments, Thompson stated the following on the record:

THE DEFENDANT: Your Honor, I actually do want to present the body cam, particular portions, to the jury.

THE COURT: It's over. You had that opportunity.

THE DEFENDANT:  Tomorrow, tomorrow during close, the latitude that I will be given in my closing argument.

THE COURT:  If it is Exhibit 6, the body cam of Officer Matt, you have the opportunity to use it during closing argument.

THE DEFENDANT:  And that is the only particular — that's the only portion of the body cam I will be able to use?

THE COURT:  That is correct.

THE DEFENDANT:  May I object to that for the record?

THE COURT:  You can make any objection you like.  That's the only body cam that's been admitted into evidence.

THE DEFENDANT:  Right.  Thank you.

**{¶ 49}** Video evidence admissibility can be based on two theories.  Under the "pictorial testimony" theory, "photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness's personal observation." *Midland Steel Prods. Co. v. Internatl. Union*, 61 Ohio St.3d 121, 129, 573 N.E.2d 98 (1991), quoting *Fisher v. State*, 7 Ark.App. 1, 5-6, 643 S.W.2d 571 (1982).

**{¶ 50}** Under the "silent witness" theory, on the other hand, "photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence." *Midland* at 130.

**{¶ 51}** In the case at hand, Thompson failed to establish the admissibility of the body cam footage under either theory, because Thompson was admittedly

unable to authenticate — or even identify — it.  Upon review, we find that the court acted within its discretion by not allowing the video evidence, and Thompson's sixth assignment of error is overruled.

## B.  Sufficiency of the Evidence

{¶ 52} In his second assignment of error, Thompson argues that there was insufficient evidence to find him guilty of felonious assault.  Specifically, Thompson argues that "evidence of the culpable mental state of knowingly was absent * * *."  Thompson does not challenge the sufficiency of the evidence concerning the other offenses of which he was convicted.

{¶ 53} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).  "In essence, sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 54} Thompson was convicted of felonious assault in violation of R.C. 2903.11(A)(1) and (2), which state that "[n]o person shall knowingly * * * (1) [c]ause serious physical harm to another * * * [or] (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."  Knowingly, as a culpable mental state, is defined in R.C. 2901.22 as follows:  "A person acts

knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 55} At Thompson's trial, the following evidence was presented that he knowingly caused serious physical harm to D.Q. D.Q. testified that the last thing she remembered on the night in question was getting on the hood of Thompson's car while the car was stopped. Officer Matt testified that he "spoke to several witnesses" who saw D.Q. "on top of the car as it was driving down the street." Officer Cornett testified that, based on his investigation of the incident in question, Thompson's vehicle "was coming westbound with supposedly [D.Q.] on the vehicle hood." Officer Cornett further testified that, based on the significant damage to Thompson's vehicle, Thompson was "not doing 25 miles an hour," which is the speed limit on the street where the crash occurred.

{¶ 56} Gutwein testified that she saw a woman standing on the hood of a car that "took off down the street like really, really fast. * * * She was * * * holding on the hood of it screaming. And then a short time later I heard a boom and it just scared me really bad, because I knew she was on the front of the car." Gutwein testified that the car was travelling at "like 70" miles per hour. Det. Moten testified that the impact of Thompson's vehicle "ripped" the fire hydrant "out of the ground," which indicated that Thompson was "not doing 25 miles per hour." Det. Moten further testified that, based on the data captured by the Module, seconds prior to Thompson crashing his car into the fire hydrant, the car was travelling between 59

and 78 m.p.h. and the driver ultimately took his foot off the accelerator, but did not hit the brakes, prior to the impact.

{¶ 57} Thompson testified that D.Q. "latches on top of the hood" of his car, and as he was "driving down the street * * * immediately she falls off." According to Thompson, he was driving his car "[a]pproximately, 15 to 25 miles per hour" with D.Q. on the hood "for a few seconds." Additionally, Thompson admitted that he was driving while under the influence of alcohol and that he was "mishandling" his vehicle. Furthermore, Thompson conceded in his appellate brief that "injury is possible in such circumstances, [but] there was nothing presented that injury would probably occur." However, the circumstantial evidence presented at trial indicates otherwise.

{¶ 58} Upon review, we conclude that the evidence presented at trial was sufficient to establish that Thompson was aware his conduct would probably cause serious physical harm to D.Q. This court has found that operating a vehicle at excessive speeds is sufficient to establish that the driver acted knowingly. *Compare State v. Takacs*, 8th Dist. Cuyahoga No. 102543, 2015-Ohio-4585, ¶ 30 (finding sufficient evidence as to the knowingly mens rea of felonious assault when the state established that the defendant was "heading directly into [the victim's] path at an apparent high rate of speed"); *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 29 (evidence that the defendant "drove her vehicle in reverse at a high rate of speed in the crowded parking lot, hitting her victims * * * was sufficient to show that Matthews acted knowingly.").

**{¶ 59}** The evidence in this case shows that Thompson was not only driving at a high speed, he was doing so with another human being on the hood of her car. A rational inference can be drawn from these facts that Thompson was aware that his conduct would probably cause serious physical harm to D.Q. *See, e.g., State v. Treesh*, 90 Ohio St.3d 460, 484-485, 739 N.E.2d 749 (2001) ("Because the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances * * *.").

**{¶ 60}** Accordingly, we find that the state presented sufficient evidence that Thompson acted knowingly, and his second assignment of error is overruled.

### C. Manifest Weight of the Evidence

**{¶ 61}** In his third assignment of error, Thompson argues that his convictions were against the manifest weight of the evidence. Specifically, Thompson argues that "the improbability of [D.Q.] hanging on top of a moving vehicle at speeds in excess of 60 Mph for over 2 city blocks [is not] credible."

**{¶ 62}** A manifest weight of the evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at

387, 678 N.E.2d 541. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 63} In addition to felonious assault, Thompson was convicted of two counts of aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) and (A)(2)(b). The pertinent parts of this statute state that "[n]o person, while operating * * * a motor vehicle * * * shall cause serious physical harm to another person * * * (1)(a) [a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code" or (2)(b) while acting "[r]ecklessly."

{¶ 64} Thompson is not challenging his conviction for violating R.C. 4511.19(A)(1)(a), operating a vehicle under the influence of alcohol. In fact, he testified that he was aware that he was operating his vehicle under the influence the evening D.Q. was injured. Therefore, we find his conviction for aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) is not against the manifest weight of evidence in the record.

{¶ 65} As to his second aggravated vehicular assault conviction, recklessly is defined in R.C. 2901.22(C) as follows: "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶ 66} Whether Thompson acted recklessly is based, in part, on the following undisputed evidence that was introduced at trial. Gutwein testified, and Thompson admitted, that he drove his vehicle while D.Q. was on the hood. Officer Cornett testified that D.Q. was found in the street "about three houses down" from where Thompson's vehicle hit the fire hydrant. With this assignment of error, Thompson challenges the credibility of the evidence of the speed at which he travelled.

{¶ 67} There is overwhelming evidence in the record that Thompson was driving "really fast" with D.Q. on the hood of his vehicle. Specifically, the state's evidence showed that Thompson's car was going 59 to 78 m.p.h. prior to and at the time of impact. Additionally, Det. Moten testified that the impact of Thompson's car "ripped" the fire hydrant "out of the ground." In fact, the only contradictory evidence of speed is Thompson's testimony that he was driving between 15 and 25 m.p.h. when D.Q. was on the hood of his vehicle.

{¶ 68} Putting aside Thompson's speed, Ohio courts consistently hold that "[e]vidence that a defendant was driving under the influence is sufficient to support a finding of recklessness." *State v. O'Linn*, 8th Dist. Cuyahoga No. 75815, 2000 Ohio App. LEXIS 1064 (Mar. 16, 2000). *See also State v. Runnels*, 56 Ohio App.3d 120, 126, 565 N.E.2d 610 (8th Dist.1989). In the case at hand, there is no evidence to dispute the fact that Thompson had been drinking alcohol when he drove his vehicle and D.Q. fell off the hood. Therefore, there is ample evidence to support a finding of recklessness.

{¶ 69} For the same reasons, we conclude that Thompson's felonious assault convictions are not against the manifest weight of the evidence. As addressed above, there is abundant evidence in the record that Thompson acted knowingly. "This court is mindful that weight of the evidence and the credibility of witnesses are primarily for the trier of fact and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt." *State v. Chavez*, 8th Dist. Cuyahoga No. 99432, 2013-Ohio-4700, ¶ 24.

{¶ 70} Accordingly, we find that Thompson's convictions for aggravated vehicular assault and felonious assault are supported by the weight of the evidence in the record, and the jury did not lose its way or create a manifest miscarriage of justice. This is not the exceptional case in which the evidence weighs heavily against the conviction, and Thompson's third assignment of error is overruled.

### D. Speedy Trial Violation

{¶ 71} In his fourth assignment of error, Thompson argues that his right to a speedy trial was violated. Specifically, Thompson's argument is limited to the following sentence in his brief: "In this instance the defendant was arrested on November 4, 2018, and demanded of the State to commence trial on multiple occasions before the October 7, 2019, trial * * *."

> Our review of a trial court's decision on a motion to dismiss for a speedy trial violation involves a mixed question of law and fact. We accord due deference to a trial court's findings of fact if supported by competent, credible evidence, but determine independently if the trial court correctly applied the law to the facts of the case. Furthermore, when

reviewing the legal issues presented in a speedy trial claim, we must strictly construe the relevant statutes against the state.

*Cleveland v. Jeric*, 8th Dist. Cuyahoga No. 89687, 2008-Ohio-1825, ¶ 19.

{¶ 72} Pursuant to R.C. 2945.71(C)(2), "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest." However, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). Speedy trial time may be extended by various tolling events found in R.C. 2945.72. For example, if the defendant's "mental competence to stand trial is being determined" or the defendant moves the court for a continuance, the resulting "period of delay" is not counted for speedy trial calculations. R.C. 2945.72(B) and (H).

{¶ 73} A defendant presents a prima facie case of a speedy trial violation by alleging that he or she was not brought to trial within the statutory time limits of R.C. 2945.71. *State v. Butcher*, 27 Ohio St.3d 28, 31, 500 N.E.2d 1368 (1986). "At that point a burden of production arose whereby the state became obligated to produce evidence demonstrating appellee was not entitled to be brought to trial within the limits of R.C. 2945.71(E)." *Id.* "The statutory speedy trial period begins to run on the date the defendant has been arrested; however, the date of arrest is not counted when calculating speedy trial time." *State v. Geraci*, 8th Dist. Cuyahoga Nos. 101946 and 101947, 2015-Ohio-2699, ¶ 21.

{¶ 74} In the case at hand, the trial court held a pretrial on the record on August 5, 2019, and Thompson raised his speedy trial rights as follows:

THE DEFENDANT: Going back to the issue of the trial date, it is my understanding that the trial date is set for three weeks from today.

THE COURT: Correct.

THE DEFENDANT: I understand that the calculations would probably have to be submitted in the motion, but the calculations are correct that the statute — the statute is clear that the trial should commence on the 12th of August, the date that is actually set for the final pretrial.

THE COURT: Well, if you're talking about speedy trial —

THE DEFENDANT: That's correct.

THE COURT: Yes. We calculated that and we made sure the trial date was within the time parameters for speedy trial. So, it does not run out on the 12th.

THE DEFENDANT: Correct.

THE COURT: There have been delays because of discovery and things that expand time. So we're good as far as the 26th. And we're going to do that day.

{¶ 75} Thompson filed a motion to dismiss for speedy trial violations on August 14, 2019, and the court held a hearing and denied the motion the same day. In his motion, Thompson calculated that 271 days had passed from the date he was arrested through August 12, 2019, and he argued that his speedy trial right had been violated.

{¶ 76} At the hearing, the state argued the following:

Without having read the motion to dismiss, I did take a brief look at the last pretrial, at the docket to see if he did have speedy trial grounds. It appeared that we are in no danger of being on top of the speedy trial as

the time was tolled in between attorneys. The time is tolled in between the pro se acknowledgment; the time tolled because the discovery, the Defendant wasn't able to view the discovery at one point in the jail. I believe that the vast majority of the continuances have been at Defense request. So, at this point in time, I would submit to the Court that we're not in violation of the Defendant's speedy trial rights.

{¶ 77} The court stated the following on the record: "All right. We have done a review because of the motion and I find that because of the various tolling events, the changes in representation and other steps that were taken during the course of this case, that the time for speedy trial has not expired and the trial will remain on August 26th." Upon review, we note that the trial court made no specific factual findings concerning Thompson's speedy trial rights other than concluding that these rights were not violated.

{¶ 78} The next prong of our speedy trial review is to determine, under a de novo standard, whether the court correctly applied the law to the facts of the case. "When reviewing a speedy trial issue, the appellate court counts the days and determines whether the number of days not tolled exceeds the time limits for bringing the defendant to trial as set forth in R.C. 2945.71." *Geraci*, 8th Dist. Cuyahoga Nos. 101946 and 101947, 2015-Ohio-2699, at ¶ 20.

{¶ 79} Thompson was arrested on November 4, 2018, and we begin his speedy trial clock on November 5, 2018. Thompson was incarcerated during the pendency of these proceedings, which means the triple-count provision applies. Thus, the felony charges against Thompson must have been tried within 90 days. If

not extended, Thompson's speedy trial timeframe would have expired February 2, 2019.

{¶ 80} The state argues that, although 336 days passed between November 4, 2018, and October 7, 2019, Thompson, who was acting pro se, "tolled a significant number of days in his case." For example, the court granted Thompson's requests for continuances from November 16, 2018 – November 19, 2018; November 28, 2018 – March 7, 2019; March 14, 2019 – March 21, 2019; April 11, 2019 – May 1, 2019; May 8, 2019 – October 7, 2019. Each of these defendant-requested continuances is a tolling event under R.C. 2945.72(H).

{¶ 81} Additionally, Thompson's competency to stand trial was "being determined" from November 28, 2018, when the court referred him to the psychiatric clinic for evaluation, until March 14, 2019, when the court held a hearing at which the parties stipulated to Thompson's competency to stand trial. This is a tolling event under R.C. 2945.72(B).

{¶ 82} Given these statutorily defined tolling events, 46 speedy trial days passed between Thompson's arrest and the commencement of his trial. Accordingly, we find no speedy trial violation under R.C. 2945.71. Thompson's fourth assignment of error is overruled.

### E. Jury Instructions

{¶ 83} In his fifth assignment of error, Thompson argues that the court erred by refusing to instruct the jury on the defense of accident, and in his tenth assignment of error, he argues that the court erred by not instructing the jury on the

defense of self-intoxication.  We review a trial court's refusal to instruct the jury as requested for "an abuse of discretion under the facts and circumstances of the case." *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 84} "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence."  *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990).  In other words, "[j]ury instructions should be tailored to fit the facts of the case." *State v. Melton*, 8th Dist. Cuyahoga No. 97675, 2013-Ohio-257, ¶ 35.

{¶ 85} Prior to closing arguments in the case at hand, Thompson requested "a jury instruction on [the] affirmative defense of accident."  Thompson cited the Ohio Supreme Court's opinion in *State v. Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888 (1973), to support his position.  The trial court denied Thompson's request for this jury instruction as follows: "In that case, the Ohio Supreme Court ruled that an accident was not an affirmative defense.  An affirmative defense would require the defense to prove that by at least a preponderance of the evidence.  He would be permitted to argue in his closing argument that this matter was an accident, but it is not an affirmative defense."

{¶ 86} Ohio courts have held that "[b]ecause the accident defense is not an excuse or justification for the admitted act, the effect of an instruction * * * would simply have been to remind the jury that the defendant presented evidence to negate the element of knowledge." *State v. Stubblefield*, 1st Dist. Hamilton No. C-890597, 1991 Ohio App. LEXIS 610 (Feb. 13, 1991).

{¶ 87} On appeal, Thompson argues that he "testified at his trial that although serious physical harm did occur to [D.Q.] the underlying result was that of an accident * * *." Thompson does not cite to where in the record this testimony can be found. After reviewing Thompson's entire trial testimony, we find no evidence to negate the element of knowledge or recklessness. In fact, Thompson testified that he was "mishandling" his vehicle after drinking Scotch, and D.Q. was on the hood of the car as he was driving down the street. Abundant other evidence — from Gutwein's testimony to the undisputed fact that the fire hydrant was pulled up out of the ground to Det. Moten's testimony, including the information derived from the Module — supports a finding that Thompson was driving at a high rate of speed while D.Q. was on the hood of the car. This evidence is inconsistent with the theory of an "accident." Therefore, the trial court did not abuse its discretion by refusing to instruct the jury on the defense of accident. Thompson's fifth assignment of error is overruled.

{¶ 88} We next turn to Thompson's tenth assignment of error, which concerns whether the court erred by not instructing the jury on the defense of self-intoxication. Our review of the record shows that Thompson failed to request a jury instruction regarding intoxication. This waives all but plain error. *State v. Cook*, 65 Ohio St.3d 516, 527, 605 N.E.2d 70 (1992). "In determining plain error, we examine all properly admitted evidence and determine whether the jury would have convicted [the defendant] even if the alleged error had not occurred." *State v. Morrow*, 8th Dist. Cuyahoga No. 79738, 2002-Ohio-5320, ¶ 18. *See also*

Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

{¶ 89} R.C. 2901.21(E) states, in part, that "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." This court has held that "a lack of capacity to form an intent to commit a crime due to self-intoxication is no longer a defense to a crime where a mental state in an element of the crime." *State v. Koballa*, 8th Dist. Cuyahoga No. 100664, 2014-Ohio-3592, ¶ 24. *See also State v. Fredericy*, 8th Dist. Cuyahoga No. 95677, 2011-Ohio-3834 ¶ 21-22 ("the defense of voluntary intoxication is no longer applicable" to negate the knowingly mental state required to prove felonious assault).

{¶ 90} Upon review, we find that the trial court did not err in failing to instruct the jury on the defense of intoxication, and Thompson's tenth assignment of error is overruled.

### F. Closing Argument

{¶ 91} Thompson's seventh assignment of error is captioned "Trial Court's Limitation of Defendant's Closing Argument." Under this heading, however, Thompson raises the issue of the "body camera evidence" that was rendered inadmissible by his failure to authenticate it addressed above in his sixth assignment of error. Notably, Thompson argues that this issue occurred "[d]uring the trial." Thompson does not make any allegations concerning his closing argument in this section, or any section, of his appellate brief. Pursuant to App.R. 12(A)(2), we "may

disregard any assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."

{¶ 92} Accordingly, we disregard this assignment of error.

### G. Bias of the Trial Judge

{¶ 93} In his eighth assignment of error, Thompson argues that he "was embarrassed in front of the jury when he attempted to introduce relevant body camera footage from several police detectives that the State did not call as potential witnesses."

{¶ 94} "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. In the case at hand, Thompson again raises the issue of the inadmissible body camera footage. Thompson fails to show, or even argue, how the trial judge was biased against him by excluding this evidence.

{¶ 95} Accordingly, Thompson's eighth assignment of error is overruled.

### H. Consecutive Maximum Prison Sentences

{¶ 96} In his ninth assignment of error, Thompson argues — and we quote this argument in its entirety from his appellate brief — "In this instance the trial court's imposition of consecutive maximum sentences was contrary to law."

{¶ 97} R.C. 2953.08(G)(2) provides, in part, that when reviewing felony sentences, the appellate court's standard is not whether the sentencing court abused

its discretion; rather, if this court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20" or (2) "the sentence is otherwise contrary to law," then we may conclude that the court erred in sentencing. *See also State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231.

{¶ 98} "[T]o impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. Pursuant to R.C. 2929.14(C)(4), the court must find consecutive sentences are "necessary to protect the public from future crime or to punish the offender"; "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and at least one of the following three factors:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction * * *, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offenders conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 99} In the case at hand, the trial court sentenced Thompson to an eight-year prison term for the felonious assault and a three-year prison term for violating the protection order. The court ran those sentences consecutively for a total of 11 years in prison. At the sentencing hearing, the court stated, in part, as follows:

> I find that a consecutive sentence is appropriate because it's necessary to punish the offender and protect the public from future crime and it is not disproportionate to the seriousness of the conduct and the danger posed by the defendant.
>
> And that two or more of these offenses are part of one or more course of conduct and the harm caused is so great or unusual that a single prison term would not adequately reflect the seriousness of the conduct.

{¶ 100} Felonious assault is a second-degree felony punishable by a prison term between two and eight years. R.C. 2929.14(A)(2). Violating a protection order while committing a felony offense is a third-degree felony punishable by a prison term between 9 and 36 months. R.C. 2929.14(A)(3)(b). Both prison terms are within the statutory range for their respective offenses, and Thompson makes no argument as to why his 11-year prison term is contrary to law. *See State v. Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 32 ("R.C. 2953.08(G)(2)(b) permits an appellate court to modify or vacate a sentence if it clearly and convincingly finds that the sentence is 'otherwise contrary to law'").

{¶ 101} Concerning consecutive sentences, we find that the trial court made the necessary R.C. 2929.14(C)(4) findings on the record, specifically, that multiple offenses were part of the same course of conduct and the harm caused by the offenses was so great or unusual that a single prison term would not adequately

reflect the seriousness of Thompson's conduct. These statutory findings were incorporated into the trial court's sentencing journal entry. Therefore, the court did not err in imposing consecutive sentences, and Thompson's ninth assignment of error is overruled.

## I. Preliminary Hearing

{¶ 102} In his eleventh and final assignment of error, Thompson argues that, because he was not afforded a preliminary hearing, "by the virtue of the procedures that had been taken in the Municipal Court of Cleveland under the provisions of Crim.R. 5 [the Cuyahoga County Common Pleas Court] had no authority to proceed under the indictment." He further argues that, on November 14, 2018, the date of his indictment, the prosecutor "failed to produce [D.Q.] to testify whether an offense of violence was committed against her and whether the defendant committed that offense." We note that, on November 14, 2018, D.Q. was in a coma.

{¶ 103} "There is no constitutional right to a preliminary hearing, such hearing being purely a creature of statute." *State v. Minamyer*, 12 Ohio St.2d 67, 69, 232 N.E.2d 401 (1967). *See also* R.C. Chapter 2937, et seq.

> The purpose of a preliminary hearing in Ohio is merely what the term implies. It is not to hear all the evidence and determine the guilt or innocence of the accused but rather to determine whether sufficient evidence exists to warrant binding the accused over to the grand jury, where, after a more thorough investigation of the evidence, it is then determined whether a formal charge shall be made against the accused.

*White v. Maxwell*, 174 Ohio St. 186, 188, 187 N.E.2d 878 (1963).

**{¶ 104}** Once an indictment has been returned, a preliminary hearing is no longer necessary. *State v. Wigglesworth*, 18 Ohio St.2d 171, 174, 248 N.E.2d 607 (1969). It is undisputed in the case at hand that Thompson was indicted on November 14, 2018. He alleges no plausible reason why the trial court lacked authority to proceed under this indictment. Accordingly, Thompson's final assignment of error is overruled.

### III. Conclusion

**{¶ 105}** Thompson's convictions for felonious assault, aggravated vehicular assault, violating a protection order, and operating a vehicle under the influence of alcohol are affirmed based on the overwhelming evidence in the record of his guilt. Indeed, Thompson himself testified to most, if not all, of the elements of the offenses of which he was convicted. Although we find no error in this case, the issues presented in this appeal pale in comparison to the undisputed evidence that Thompson drove his vehicle while D.Q. was on the hood, and she fell off the car sustaining permanent brain damage.

**{¶ 106}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

LARRY A. JONES, SR., P.J., and
MARY EILEEN KILBANE, J., CONCUR