[Cite as *State v. Petzke*, 2025-Ohio-2031.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

Katherine Petzke

    Appellant

Court of Appeals No.  L-24-1009

Trial Court No.  CR0202301799

**DECISION AND JUDGMENT**

Decided:  June 6, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is an appeal by appellant, Katherine Petzke, from the December 21, 2023 judgment of the Lucas County Court of Common Pleas.  For the reasons that follow, we affirm the trial court's judgment.

**{¶ 2}** Petzke sets forth five assignments of error:

I.  The prosecution engaged in willful misconduct through the admission of inadmissible hearsay, coupled with the inadmissible and unauthenticated "ShotSpotter" recording, this error is egregious, deliberately undermined a fair trial after jeopardy attached, and discharge is required[.]

II.  Trial counsel provided ineffective assistance of counsel through the failure to investigate and object to inadmissible and prejudicial hearsay, which also violated Ms. Petzke's constitutional rights of confrontation and other inadmissible evidence, and seek a mistrial, or alternatively, the court committed plain error in the admission of inadmissible evidence[.]

III.  Trial defense counsel was prejudicially ineffective for failing to recognize the conflicting nature of the co-defendant's claims and failing to move to sever the cases, and for failure to engage in the proper cross examination of witnesses, including the co-defendant[.]

IV.  The convictions are insufficient of evidence, and the convictions stand contrary to the manifest weight of the evidence[.]

V.  Cumulative error

## Background

**{¶ 3}** This case involves the shooting of two people over the use of a driveway.

**{¶ 4}** On May 18, 2023, Petzke lived with her boyfriend Kakuan Williams in a rented house at 1322 Elmwood Avenue, Toledo, Ohio, which was across the street from Ms. C.G. and Mr. B.W., who lived at 1323 Elmwood. The neighbors did not know each other. Around noon, Williams was at work and Petzke was home when C.G. and B.W. pulled their rental car into Petzke and Williams' driveway. C.G. and B.W.'s property did not have a driveway. Petzke came out of her home and exchanged angry words with

2.

C.G. and B.W. over the driveway.  Petzke phoned and texted Williams about the encounter; C.G. and B.W. drove away.

{¶ 5} Petzke then left home to pick up Williams from work.  Meanwhile, C.G. and B.W. arrived back at their house.  Once Williams and Petzke got home, Williams, armed with a gun, went across the street to C.G. and B.W.'s house; Petzke later followed.  C.G. and B.W. were outside on their property when Williams walked up to them and fired his gun, shooting both C.G. and B.W.  Petzke and Williams walked home.  Police were called.  Williams and Petzke were arrested.  C.G. and B.W. were taken to the hospital.

{¶ 6} On May 25, 2023, an indictment was filed charging Petzke with two counts of felonious assault, each with a firearm specification ("spec"), both felonies of the second degree.[1]  Thereafter, Petzke was arraigned and entered pleas of not guilty.

{¶ 7} A jury trial commenced on November 27, 2023, and concluded on December 1, 2023.  Petzke was found guilty of both felonious assault counts and the specs.

{¶ 8} On December 19, 2023, Petzke was sentenced to a two-year prison term for each count of felonious assault, for a minimum term of four years and a maximum term of five years; the sentences were ordered to be served consecutively.  She was also ordered to serve mandatory and consecutive prison terms of three years for each spec.

{¶ 9} Petzke appealed.

---

[1] Williams was also charged with crimes, tried with Petzke, and convicted.  He filed a separate appeal and is not a party to this appeal.

**The Trial**

{¶ 10} The State called nine witnesses to testify and offered into evidence numerous exhibits. The defense did not object to any of the exhibits; the exhibits were admitted. Williams testified, claiming self-defense. Petzke did not testify. The relevant trial testimony is summarized below.

**Sergeant Stephen Zarecki**

{¶ 11} Sergeant Zarecki, with TPD, testified that on May 18, 2023, he received a message from dispatch of shots fired at 1323 Elmwood, which was based on a Shot Spotter call. Zarecki responded, with a body worn camera ("BWC") activated, and he was the first officer on scene. He found two victims with gunshot wounds and asked who shot them; the victims pointed across the street.

**Detective Kristi Eycke**

{¶ 12} Detective Eycke testified she worked with TPD's crime scene unit and was called to 1323 Elmwood. Officers were given permission to enter that home where they located the Glock .40 used in the shooting. Petzke's .9-millimeter pistol was also found.

**B.W.**

{¶ 13} B.W. testified that around noon on May 18, 2023, he was driving a rental car with C.G. as the passenger when he pulled into the driveway at 1323 Elmwood. Petzke ran out of her house, "real mad" and yelled at them to get out of her driveway. Petzke threatened to shoot C.G. in the face and B.W. saw Petzke pull a gun out of her waistband.

4.

{¶ 14} C.G. got out of the car and went to get the couple's van while B.W. pulled out of the driveway and waited in the street for C.G. As he waited, he and Petzke argued back and forth. B.W. told Petzke he owned a weapon and was not afraid of guns. Petzke said she had a .40 that "barks." C.G. then pulled up behind B.W. and the couple drove away.

{¶ 15} Later, B.W. and C.G. returned home and were in their backyard when Williams, who B.W. did not know, walked to the backyard holding a gun. B.W. saw Petzke, who was behind Williams, holding a .9-millimeter pistol. Petzke told Williams "'shoot them both. Kill them.'" Williams shot B.W. and C.G. Petzke and Williams then went home. B.W. was shot about five times and was hospitalized for two to three weeks.

**C.G.**

{¶ 16} C.G. testified consistently with her fiancé, B.W. In addition to his testimony, C.G. testified that when B.W. pulled into Petzke's driveway, C.G. got out of the car and Petzke ran outside yelling and cussing. C.G. told Petzke to go back in the house as B.W. was only going to be there for two seconds. C.G. and Petzke argued; Petzke said she would shoot C.G. in the face and C.G. said she would shoot her back, in the face.

{¶ 17} C.G. walked to her van and drove it down the street to turn around while B.W., who was in the street, had words with Petzke. B.W. and C.G. then drove off.

{¶ 18} After C.G. and B.W. arrived home, they were in their backyard when their dogs started barking. C.G. saw Williams, who she did not know, and asked him if she

could help him. Williams asked, "where's your dude at?" as he walked towards the backyard. Williams had a gun and said, "bitch, I will shoot you in the face. Where the fuck is your dude at?" C.G. saw Petzke run across the street and when Petzke got closer, C.G. saw Petzke had a gun. Williams seemed angry and mad and Petzke was "[m]ad, red." Petzke said to Williams, "shoot them both, baby. Kill them." Williams said, "oh, you said you was going to whoop my ass," then Williams shot C.G. and B.W. "point blank like two feet away." Williams and Petzke walked away. C.G. was shot twice and was in the hospital for one day and still has scars.

**Detective Danielle Mooney**

{¶ 19} Detective Mooney, with TPD's Crimes Against Persons Division, testified that she was called to 1323 Elmwood, and assisted in the search for evidence. She was told Williams made a statement to Sergeant Lendhart that he shot people in self-defense. She also reviewed the Shot Spotter report which she accessed from the computer in her car to get an idea of where the crime scene was and where shell casings were located. Based on the report, the search shifted to the backyard of 1322 Elmwood. She also reviewed the Shot Spotter audio recordings.

{¶ 20} Mooney was shown a copy of the Shot Spotter report and acknowledged it was an accurate copy. She testified the report was an investigative lead summary designed to help with the police investigation, and the report identified four shots. She was also asked about the audio recordings and testified they were fair and accurate

6.

sounds that she heard when she was investigating, and she noted she could hear four shots on one recording and five shots on another recording.

{¶ 21} Mooney went to the safety building to speak with Petzke and Williams. Petzke's interview "didn't seem to really have a lot of common sense to it." Mooney asked Petzke if she had a gun and Petzke said no, when asked again, Petzke admitted that she owned a gun. Petzke acknowledged that she cussed at B.W. and C.G., she "got pissed" and told B.W. and C.G. to get the fuck away from her.

{¶ 22} Petzke originally told Mooney that Williams was home when the driveway encounter occurred, and only five minutes passed before the second encounter happened, where Petzke gathered Williams from inside the house and they went over and knocked on C.G. and B.W.'s door for a peaceful resolution.

{¶ 23} Mooney reviewed the phone dumps from Petzke and Williams' phones, and asked Petzke about the text message she sent Williams at 12:12 p.m. that said Petzke was about to be in a shootout, and the 12:40 p.m. text message from Petzke to Williams that said "here." Mooney noted the Shot Spotter indicated the shooting was at 12:59 p.m. and Williams worked either 16 or 18 miles from Elmwood.

{¶ 24} Mooney interviewed Williams and there were a lot of inconsistencies between his statement and Petzke's statement.

**Williams**

{¶ 25} Williams testified that on May 18, 2023, Petzke drove him to work at Amazon, and dropped him off for his 7:00 a.m. shift. They exchanged text messages, and

7.

at about 12:05 p.m., she texted him that she was about to get in a shootout and followed up with "yeah, I definitely think I'm getting in a shootout." He called her and heard a male voice say "bitch, I got a .38 on me, and I'm about to let it bark." Williams also heard Petzke say "you guys seriously need to just leave."

{¶ 26} Petzke picked Williams up at work at 12:38 to 12:40 p.m., and when they got home, he asked "who had done this? . . . [W]ho caused these problems, these issues?" She pointed across the street. Williams already had his firearm and told Petzke to stay home while he went over to talk to the people and get their side of the story. He went across the street and eventually Petzke walked up behind him. C.G. started yelling at Petzke and the women started arguing. Williams said he thought B.W. had a gun and Williams testified that B.W. said, "I'll fucking kill you," so Williams fired two shots at B.W. Williams and Petzke returned home. Williams said Petzke did not have a gun while at 1322 Elmwood and she never told him to shoot or kill anyone.

### The Appeal

{¶ 27} Before we address Petzke's assignments of error, we note they, for the most part, do not comply with Ohio law, as the law requires that arguments be supported by citations to legal authority and application of the facts to that authority. *See* App.R. 12(A)(2) and App.R. 16(A)(7). Nonetheless, we will address Petzke's arguments, as presented, keeping in mind that "appellant has the burden of demonstrating error on appeal[.]" *State v. Knight*, 2022-Ohio-1787, ¶ 46 (6th Dist.).

8.

**First Assignment of Error**

**Petzke's Arguments**

{¶ 28} Petzke argues that the State engaged in willful misconduct through inadmissible hearsay, the inadmissible, unauthenticated Shot Spotter recording and the following portion of the State's closing, where the prosecutor said:

> Sergeant Lendhart's body worn camera, [J.B], the next door neighbor in the Bronco shirt. It is on body worn camera. Watch the body worn camera. Maybe the State's case, maybe the Defendant's case, or maybe it was just that simple.
> [B.W.] and [C.G.] backed up in the []driveway of Katherine Petzke, and she was tired of it. She immediately jumped out of the house and started going at them.
> She then went to retrieve a guy, [Williams], and came back with [Williams]. They came over and fired. [J.B.] said it himself. They fired over a parking spot while [C.G.] and [B.W.] were sitting on their own property.

{¶ 29} Petzke states "[t]his is a claim that operates upon several separate pieces of evidence, and those pieces of evidence generate three claims themselves, misconduct, ineffective assistance and plain error," and the evidence was inadmissible and prejudicial.

{¶ 30} Petzke argues that J.B. did not testify, therefore there was a "confrontation violation" and he was not subject to cross-examination. In addition, she asserts J.B.'s statement was hearsay and significant portions of the statement were inadmissible as pure speculation because J.B. had no personal knowledge, thus those portions were prejudicial and of little to no probative value. The only portions of J.B.'s statement that Petzke references are where he "describes the uncontested fact that Ms. Petzke left after the initial encounter, and returned with Mr. Williams. . . However, [J.B.] also provides the

9.

officer with statements asserting a speculative purpose that he assumes from Ms. Petzke leaving and returning, i.e., that she 'retrieved' Mr. Williams, and further that the[re] was a retaliatory purpose in the retrieval 'over a parking spot[.]'" Petzke claims J.B.'s speculation had "little to no probative value and grave prejudicial effect[.]" In support, she sets forth "See, e.g., Ohio R. Evid. 403, 602: *Berger v. United States*, 295 U.S. 78, 88-89, 55 S. Ct. 629, 633 (1935)."

{¶ 31} Petzke further asserts that State's exhibit 3 (the redacted version of Lendhart's BWC video) contains inadmissible hearsay from an anonymous female who said "[s]he started shooting." Petzke argues the accusation against her "as elucidated through the bill of particulars alleges complicity in felonious assault for the shooting of the victims . . . and is predicated upon . . . Petzke provid[ing] verbal encouragement to Mr. Williams to shoot the victims." She submits she was not accused of shooting, as the victims survived and neither said Petzke was shooting or shot them, yet the State insinuated she did shoot.

{¶ 32} Petzke maintains that her trial counsel's failure to object to J.B.'s statement and her counsel's failure to review exhibit 3 for redactions does not relieve the State of its "duty to justice."

{¶ 33} Petzke contends that "[t]he jury, in deliberation, followed the prosecutor's request to review the inadmissible evidence it had presented and asked to review State's Exhibit 3 . . . [and] the 911 calls. . . The jury also had a printed copy of the Computer

10.

Aided Dispatch [("CAD")] reports, wherein a written claim that a w/f (white female) had a gun was presented and read to the jury despite it being hearsay."

{¶ 34} Petzke also argues that "[i]t is presumed that the jury took [her] attorney's arguments seriously: If she did have a gun, and she was at the property there is a real easy way to show she shared the same criminal intent. She would have shot the gun. But she didn't, number one, have a gun. That's in dispute. Number two, there [are] no bullets from Katie [Petzke], from the .9 millimeter at the scene."

{¶ 35} Regarding the Shot Spotter recording, Petzke submits it was inadmissible and "Det. Mooney's speculative testimony of its contents should never have been before the jury without expert authentication and is also extremely prejudicial."

{¶ 36} Petzke sets forth the standard of review is "'whether a prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U. S. 637, 643 (1974). She cites Crim.R. 52(B) which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

**State's Arguments**

{¶ 37} The State argues that Petzke did not object to what she alleges was misconduct by the prosecutor in offering supposedly inadmissible hearsay and unauthenticated evidence. Thus, this court must consider Petzke's arguments under the plain error standard. The State submits there was no prosecutorial misconduct and, even

11.

if there was misconduct, Petzke was not deprived of a fair trial. The State also asserts there was overwhelming evidence which proved her complicity in the felonious assaults.

{¶ 38} The State notes Petzke claims there were four hearsay statements which violated her constitutional right to confront witnesses: (1) J.B.'s 911 call; (2) J.B's statement to Sgt. Zarecki, eight minutes after the shooting; (3) a female voice in the background of State's exhibit 3; and (4) the CAD report. The State contends Petzke's claims are meritless. The State also observes Petzke's claims that the Shot Spotter recording was not authenticated or admissible are without merit.

**911 Call**

{¶ 39} The State argues, with respect to Petzke's suggestion that J.B. was distracted on the 911 call and the call was hearsay, if J.B. was distracted, a reasonable listener would recognize that J.B. was calling for help in the midst of an ongoing emergency and the distraction was the result of the emergency and the resultant excitement. The State submits that Petzke concedes it was "a potentially excited utterance." The State asserts the call was an excited utterance and/or a present sense impression which are exceptions to the hearsay rule. *State v. Tawny*, 2019-Ohio- 3238, ¶ 81 (11th Dist.).

**J.B's Statement to Zarecki on BWC**

{¶ 40} The State asserts assuming arguendo that J.B.'s statement to Zarecki was hearsay, it was subject to at least two hearsay exceptions: present sense impression under Evid.R. 803(1) ("[a] statement describing or explaining an event or condition made while

12.

the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate a lack of trustworthiness"), and excited utterance, citing *State v. Travis*, 2006-Ohio-787, ¶ 36-37 (2d Dist.) (the declarant made an excited utterance immediately after the police arrived about events that occurred an hour beforehand).

{¶ 41} The State contends the shooting was at about 12:59 p.m., Zarecki arrived at Elmwood at about 1:02 p.m. and was approached by J.B. at about 1:14p.m. The State sets forth the full exchange between Zarecki and J.B. and asserts what J.B. told Zarecki was an excited utterance with no indication of untrustworthiness.

**Female Voice in the Background of State's Exhibit 3**

{¶ 42} The State contends that Petzke's claim that the fleeting female voice in the background of exhibit 3 was inadmissible hearsay is meritless for several reasons. First, the officer was attempting to obtain information to assist in resolving an unfolding emergency. Next, the State did not offer the female voice for its truth, as the State tried the case under a complicity theory, so there was no need to prove Petzke pulled the trigger. Moreover, B.W. and C.G. did not testify that Petzke fired her pistol, there were no casings from Petzke's gun found at the scene and Williams testified Petzke did not even have her gun during the second encounter. Last, the female voice was clearly an excited utterance and/or a present sense impression.

**The CAD Report**

{¶ 43} The State asserts the CAD report was not inadmissible hearsay because it qualifies as a police report which is a public record that contains "matters observed

13.

pursuant to a duty imposed by law as to which matters there was duty to report" and is admissible into evidence pursuant to Evid.R. 803(8)(b). The State argues the CAD report was also excluded from hearsay under Evid.R. 803(6), "Records of Regularly Conducted Activity." The State contends the reference in the CAD report about the "W/F" having a gun is entirely consistent with J.B.'s 911 call, thus the State offered independent evidence of what the dispatcher recorded in the CAD report.

**Shot Spotter**

**{¶ 44}** The State contends, despite Petzke's claim that the Shot Spotter recording was unauthenticated and inadmissible, that Detective Mooney authenticated the Shot Spotter. As to Petzke's suggestion that expert testimony was required to authenticate it, the State notes that she offered no authority, legal or otherwise, to support her argument and she did not object on the basis that Mooney was not an expert.

<strong>Law</strong>

**Plain Error Standard**

**{¶ 45}** Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." For an error to be plain error under Crim.R. 52(B), three prongs must be satisfied: (1) there must be an error, which means a deviation from a legal rule; (2) the error must be an obvious defect in the trial proceeding; and (3) the error, with reasonable probability, was prejudicial, in that it affected the outcome of the trial. *State v. Knuff*, 2024-Ohio-902, ¶ 117, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

14.

**Prosecutorial Misconduct**

{¶ 46} Misconduct occurs when a prosecutor makes an improper statement which causes prejudice to a defendant. *State v. Binder*, 2000 WL 145116, *2 (6th Dist. Feb. 11, 2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Factors an appellate court should consider in deciding whether prejudice occurred include: (1) the nature of the statements, (2) whether an objection was lodged, (3) whether corrective instructions were given, and (4) the overall strength of the evidence against the defendant. *Binder* at *2. Another factor is whether the misconduct was an isolated occurrence in an otherwise correctly tried case. *Id.*, citing *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist. 1995). A reversal due to prosecutorial misconduct is unwarranted unless it is clear, beyond a reasonable doubt, the outcome of the trial would have been different but for the misconduct. *Binder* at *2, citing *Smith* at 15.

**Evidence**

{¶ 47} Evid.R. 803 states in relevant part:

{¶ 48} The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> (1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness.

> (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
> . . .

15.

(6) Records of Regularly Conducted Activity.  A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . .
. . .

(8) Public Records and Reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report. . . .

{¶ 49} Evid.R. 901(A) provides:

The requirement of authentication or identification as a condition precedent to admissibility [of evidence] is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

{¶ 50} In *State v. Neal*, 2024-Ohio-5735, ¶ 37-38 (6th Dist.), this court set forth:

The Confrontation Clause is automatically satisfied when hearsay evidence is presented under Evid.R. 803. . . . *See State v. Johnson*, 2006-Ohio-1232, ¶ 30 (6th Dist.); *see also Columbus v. C.G.*, 2021-Ohio-71, ¶ 52 (10th Dist.).

. . . [911 calls and statements made to police and medics] are generally considered nontestimonial or made for neither investigative nor prosecutorial purposes.  *See State v. Santellana*, 2020-Ohio-5041, ¶ 25 (6th Dist.) (A 911 call is generally admissible under the ex[c]ited utterance or present sense impression exceptions to explain the course of the police investigation.); *State v. Sproles*, 2023-Ohio-3403, ¶ 30 (6th Dist.) (Statements made to police while victim was under the stress of an ongoing emergency were nontestimonial excited utterances.); *State v. Reynolds*, 2018-Ohio-40, ¶ 52 (6th Dist.), citing *State v. Ridley*, 2013-Ohio-1268, ¶ 49 (6th Dist.) (A description of the injuring event and identification of the

16.

perpetrator to medical personnel may fall within the medical diagnosis and treatment exception.).

**{¶ 51}** In *State v. Thompson*, 2021-Ohio-376, ¶ 39-40 (8th Dist.), the court held:

The information contained in the [crash data retrieval] Report is not hearsay because the Report does not consist of "statements" made by a "person" as contemplated by the Rules of Evidence. As this court recently held, "[t]here is no 'statement' for hearsay purposes where a witness does not testify about 'what someone else said, wrote, or did.'" *State v. Wingfield*, . . . 2019-Ohio-1644, . . . ¶ 32 [(8th Dist.)], quoting *State v. Maiolo*, . . . 2015-Ohio-4788, . . . ¶ 14 [(2d Dist.)].

In *Gray v. Fairview Gen. Hosp.*, . . . 2004-Ohio-1244, . . . ¶ 8-12 [(8th Dist.)], this court held that information generated by "computer aided detection ("CAD") in mammography" was not inadmissible hearsay. [T]he CAD device is not a *person.* The results were not the consequence of a search of [a] database of information created by a person, the accuracy of which would depend upon the accuracy and completeness of the database. . . . Therefore, we do not find the computer analysis to be hearsay. (Emphasis sic.)

### Analysis

**{¶ 52}** Since Petzke did not object to the admission of the alleged hearsay evidence, we review for plain error. With respect to the statements in J.B.'s 911 call, J.B.'s statement to Zarecki and the female voice in the background of State's exhibit 3, we find these statements are nontestimonial and were not made for investigative or prosecutorial purposes. We further find the statements are admissible under the excited utterance and present sense impression hearsay exceptions to explain the May 18, 2023 encounter between Petzke, Williams, B.W. and C.G.

**{¶ 53}** Regarding the CAD report, we find it admissible as it is not a statement by a person, or alternatively, it falls under the public record and record of regularly

17.

conducted activity hearsay exceptions. With respect to the Shot Spotter report and audio recordings, we find that Detective Mooney properly authenticated them by testifying they were accurate. We further find the Shot Spotter report and recordings were not inadmissible since they were not statements by a person, or alternatively, they fall under the public record and record of regularly conducted activity hearsay exceptions. Furthermore, Petzke provided no legal authority to support her contention that expert testimony was required to authenticate the Shot Spotter report or recordings.

{¶ 54} Accordingly, we find Petzke's first assignment of error not well-taken.

## Second Assignment of Error

{¶ 55} Petzke argues her trial counsel provided ineffective assistance through the failure to investigate and object to inadmissible and prejudicial hearsay and the failure to seek a mistrial. She asserts, alternatively, that the trial court committed plain error in admitting inadmissible evidence. Petzke references, inter alia, the 911 call, redacted BWC video, and the CAD report, and again generally claims the evidence was inadmissible, hearsay and/or in violation of the confrontation clause.

{¶ 56} Petzke sets forth the standard of review for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 688 (1984). She contends when evaluating an ineffective assistance claim due to failure to object, "the question is whether the objection . . . would have been sustained or granted, and if there was a reasonable probability that the outcome could-if such prejudice is not presumed due to

lack of investigation-have been different without [t]he deficient performance.  *State v. Conway*, . . . 2006-Ohio-2815, . . . ¶ 104-105.”

{¶ 57} Petzke argues her trial attorney did not appear to realize the lack of viability of Williams’ self-defense claim and did not appear to have engaged in a thorough investigation of the case, which “is unsurprising, as trial counsel only entered an appearance weeks before the trial.”  In addition, she maintains counsel failed to recognize the danger inherent in the conflicted interests between her and Williams.

**Law and Analysis**

{¶ 58} As set forth above, to prevail on ineffective assistance of counsel claim, appellant must establish: (1) counsel’s performance was deficient to the extent that “counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment”; and (2) “the deficient performance prejudiced the defense.”  *Strickland* at 687.

{¶ 59} Deficient performance is conduct which falls below an objective standard of reasonable representation.  *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.  A reviewing court must indulge a strong presumption that trial counsel’s performance falls within the wide range of reasonable representation.  *Strickland* at 689.

{¶ 60} To demonstrate prejudice, appellant must show there existed a reasonable probability that, but for counsel’s errors, the outcome of the proceeding would have been different.  *State v. Sowell*, 2016-Ohio-8025, ¶ 138.  Counsel’s failure to do an act which

19.

is futile cannot be a basis for a claim of ineffective assistance of counsel, nor is the failure prejudicial. *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.).

{¶ 61} Upon review, Petzke's arguments that her trial counsel was ineffective for not objecting to inadmissible, prejudicial, hearsay and confrontational evidence are based on the same evidence that she mentioned in her first assigned error. Having found that evidence was not inadmissible, we find Petzke's arguments are without merit.

{¶ 62} Petzke also asserts her trial counsel did not recognize the conflict of interest between her and Williams, and counsel did not appear to thoroughly investigate the case or realize the lack of viability of Williams' self-defense claim. These assertions are based on speculation, not on evidence in the record. Claims based on speculation are not sufficient to establish ineffective assistance of counsel. *See State v. Short*, 2011-Ohio-3641, ¶ 119. As such, we find these assertions without merit.

{¶ 63} Accordingly, we find Petzke's second assignment of error not well-taken.

### Third Assignment of Error

{¶ 64} Petzke argues her trial counsel provided ineffective assistance by failing to move to sever her case from Williams' case and failing to properly cross-examine witnesses. Petzke argues, again, that trial counsel provided ineffective assistance by failing to recognize the conflicting nature of Williams' claims and fully investigate the case.

20.

{¶ 65} Petzke sets forth the standard of review is the same for this assigned error as it was in her second assigned error. She cites no other authority in support of her arguments.

{¶ 66} Upon review, we find Petzke's arguments that her trial counsel was ineffective for failing to recognize the conflicting nature of Williams' claims and fully investigate her case were addressed and rejected in her second assignment of error.

{¶ 67} Regarding Petzke's assertion that her trial counsel was ineffective for failing to move to sever Petzke's case from Williams' case, Crim.R. 8(B) allows for joinder of defendants, but a defendant may seek severance from that joinder under Crim.R. 14.

{¶ 68} Crim.R. 8(B) provides in pertinent part that "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." Crim.R. 14 states in relevant part that "[i]f it appears that a defendant . . . is prejudiced by a joinder of . . . defendants . . . for trial together of indictments, . . . the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

{¶ 69} A defendant has the burden of providing the trial court with sufficient information so the court can weigh the considerations favoring joinder against a defendant's right to a fair trial. *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). A severance should be granted only if there is a serious risk that a joint trial would

21.

compromise a specific trial right of one of the defendants, or if it would prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro v. United States,* 506 U.S. 534, 539 (1993). Even when the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.*

{¶ 70} It is a reasonable trial strategy of defense counsel to try co-defendants together as counsel may have thought that trying the defendants together would be beneficial to counsel's client. *State v. Langford*, 2003-Ohio-159, ¶ 49 (8th Dist.). The *Langford* court stated that Langford's "trial counsel may have believed that the evidence was such that the jury would believe his co-defendants were entirely responsible for the murder of the victim, and that the jury would, as a result, convict only his co-defendants." *Id.* That court therefore found that counsel's tactical decision not to seek separate trials did not constitute ineffective assistance of counsel. *Id.*

{¶ 71} Upon review, Petzke's counsel's trial strategy may have been not to seek a separate trial for Petzke as counsel may have reasonably believed that it was to Petzke's advantage to be tried with Williams as the evidence was such that the jury may decide that Williams was entirely responsible for the assaults on B.W. and C.G., given that Williams testified that Petzke never encouraged him to shoot. Counsel may have wanted to direct the attention on Williams, the person to whom the evidence most clearly pointed, so that the jury would choose to convict him alone and not Petzke. Hence, we conclude that Petzke's counsel's decision not to pursue severance may be considered reasonable trial strategy, and did not constitute ineffective assistance.

22.

{¶ 72} Concerning Petzke's argument that her trial counsel was ineffective for failing to properly cross-examine witnesses, Petzke mentions only Williams. Petzke contends that Williams' odd claims regarding the number of shots he fired added to the impression that Petzke potentially was shooting, and his suggestion that there were only two shots strains credulity. She also asserts that Williams did not admit to both assaults as he vehemently denied shooting C.G., and indicated there was some "ricochet effect . . . However [C.G.] was not in the vicinity of when [Williams] aimed at [B.W.]."

{¶ 73} Upon review, while Petzke maintains that her counsel was ineffective for not cross-examining Williams, she fails to suggest what questions should have been posed or how Williams would have answered. Thus, Petzke is engaging in conjecture that Williams' cross-examination would have affected the jury's verdict. This type of vague speculation is insufficient to establish ineffective assistance of counsel. *State v. Perez*, 2009-Ohio-6179, ¶ 217, citing *State v. Were*, 2008-Ohio-2762, ¶ 219.

{¶ 74} Accordingly, we find Petzke's third assignment of error not well-taken.

## Fourth Assignment of Error

**Petzke's Arguments**

{¶ 75} Petzke argues her convictions are insufficient of evidence and stand contrary to the manifest weight of the evidence. She asserts the State's "only claim for complicity is, as elicited in the bill of particulars . . . is the accusation that . . . "'Another verbal altercation ensued, at which point [Petzke] tells Williams, 'kill them.'"'" She submits "the legal question before the Court in this sufficiency challenge is whether the

23.

prosecution presented sufficient evidence to prove this accusation [that she said "kill them"] beyond a reasonable doubt." She maintains "[s]he met the challenge." She asserts "[t]he claim of Ms. Petzke's statements is contradicted by Mr. Williams[,]" and "the claim . . . made by C.G. and B.W. . . . [was] not made until far into the investigation. A[s] defense counsel points out, these claims only came out months after the incident."

{¶ 76} Petzke further argues "[e]ven the prosecutor seems to understand how shockingly unlikely these claims are, as, in the final closing, the issue is conceded. 'So even if you don't want to believe she yelled, shoot them. Kill them, that's one, advised or incited. She supported. She assisted. She drove him there. But for Katherine Petzke none of this would have happened.'" Petzke contends that "Williams is not an automaton that Ms. Petzke set on a path of destruction. Just driving him home can hardly constitute complicity in him gunning down the neighbors."

{¶ 77} Petzke claims "[t]his . . . also undermines the jury's verdict on [m]anifest weight grounds. She submits "[t]he jury fairly obviously DID, properly, reject the accusation by the prosecution, and, as evidenced by the viewing of State's Exhibit 3, instead appears to have followed another theory of guilt- however, that theory was not actually charged, or even alleged and the jury thereby lost its way and rendered a verdict unworthy of confidence." Petzke sets forth the standards for sufficiency of the evidence and manifest weight of the evidence but cites to no other legal authority.

24.

**The State's Arguments**

{¶ 78} The State counters Petzke was tried on a complicity theory, not as the principal actor, and the evidence overwhelmingly demonstrates Petzke is guilty of complicity. The State cites to Ohio's complicity statute, R.C. 2923.03(A)(2), which states in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of an offense shall . . . [a]id or abet another in committing the offense." The State submits to support a complicity conviction, there must be evidence showing a defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and . . . shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime. *State v. Johnson*, 2001-Ohio-1336, syllabus. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense." *State v. Tuggle*, 2010-Ohio-4162, ¶ 80 (6th Dist.) (When a person sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to the person at the time, the person is criminally liable for the direct, proximate and inevitable consequences resulting from the original act.).

{¶ 79} The State argues that during the driveway encounter, Petzke told C.G. that "I'm going to send my dude over to shoot you," and Petzke threatened to shoot C.G. in the face, which manifested Petzke's intent. The State asserts Petzke's text to Willaims that "I'm about to be ina shootout," concerned him so much that he called her. Williams testified that Petzke put him on speaker phone so he could hear the encounter. Petzke

25.

then drove to Williams' work, picked him up and on the drive home, according to Williams, she told him B.W. and C.G. were going to "scope 1323 Elmwood," and B.W. threatened to kill Williams and "whoop Williams' ass."

{¶ 80} When Williams went across the street with his gun to B.W. and C.G.'s property he was "mad, red." The State contends Petzke followed with a pistol in her hand which shows she manifested an intent to, at a minimum, commit a felonious assault with a firearm. The State argues Petzke told Williams to shoot and kill both B.W. and C.G. and "egged" on Williams. After the shooting, Petzke did not render aid or call 911.

{¶ 81} The State maintains that Petzke was no bystander as the facts and inferences demonstrate she supported, assisted, encouraged, cooperated with, advised, and incited Williams (the principal) to commit the assaults, and she shared Williams' intent. The State submits the consequences of Petzke's actions were foreseeable and were either known or should have been known to her at the time. The State cites, inter alia, *State v. Young*, 2020-Ohio-462, ¶ 62 (10th Dist.) (holding defendant's relationship with the victim, fleeing the crime scene with principal offender, failing to report the crime, and assisting in attempting to cover up the crime were evidence defendant shared principal's purpose) and *State v. Dortch*, 2012-Ohio-6196, ¶ 30-33 (10th Dist.) (the fact that defendant fled the scene of the crime with principal offender, discussed the shooting on his cell phone and did not report the shooting supports conviction for murder under a complicity theory).

**{¶ 82}** The State further argues that Petzke's attack on the credibility of B.W. and C.G.'s testimony that Petzke told Williams to shoot them and kill them is unavailing in light of *State v. Tuggle*, 2023-Ohio-3965, ¶ 64 (6th Dist.) ("When there is more than one believable interpretation of the evidence, we do not choose which theory we believe is more credible and substitute it for the theory chosen by the [factfinder].").

**{¶ 83}** The State submits that Petzke's manifest-weight challenge is meritless and so is her sufficiency challenge, for the same reasons. The State cites *State v. Zich*, 2011-Ohio-6505, ¶ 122-123 (6th Dist.) ("Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency."

### Additional Law

**Knowingly**

**{¶ 84}** R.C. 2901.22(B) provides:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

27.

**Felonious Assault**

{¶ 85} R.C. 2903.11(A)(1) states in relevant part that "[n]o person shall knowingly . . . [c]ause serious physical harm to another."

**Complicity**

{¶ 86} R.C. 2923.03(F) states that "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

**Analysis**

{¶ 87} In order for Petzke to be guilty of two counts of felonious assault and the specs under a complicity theory, the State was required to prove that Williams caused serious physical harm to B.W. and C.G. with a firearm and Petzke aided and abetted Williams.

{¶ 88} Upon review, we find Petzke's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. The record included evidence that Petzke initiated contact with her live-in boyfriend, Williams, during her driveway encounter with B.W. and C.G. when Petzke texted Williams to inform him she was "about to be ina shootout," and when he called her, she put him on speaker phone so he could hear her interactions with B.W. and C.G. There was also evidence that she facilitated Williams' return to their home when she drove to his workplace, picked him up, he collected his gun from her car and while driving home, she goaded him by telling

28.

him their home was going to be scoped out by B.W. and C.G., and B.W. threatened to kill Williams and "whoop Williams' ass." There was evidence that upon arriving home, Williams, with his gun, went across the street to B.W. and C.G.'s property; he told Petzke to stay home. However, before long, Petzke, with her gun, followed Williams. There was also evidence of Petzke's involvement with Williams immediately prior to the shooting when she encouraged him to shoot them, kill them. Finally, there was evidence that Petzke went home without rendering aid to B.W. or C.G. or calling 911 for help.

{¶ 89} We further find that Petzke's criminal intent to commit felonious assaults can be inferred from the circumstances surrounding the shootings of B.W. and C.G. The record consisted of evidence that Petzke supported, assisted, encouraged and incited Williams in shooting B.W. and C.G., and Petzke shared Williams' criminal intent when Petzke set in motion a sequence of events that led to the infliction of serious physical injuries on B.W. and C.G. Petzke included Williams in her driveway encounter with B.W. and C.G., Petzke fetched Williams at work then instigated and facilitated Williams' confrontation with B.W. and C.G., knowing that Williams possessed a gun. Petzke participated in the confrontation of B.W. and C.G. and assisted after the encounter by not helping the shooting victims and by being uncooperative with the police.

{¶ 90} Accordingly, we find Petzke's fourth assignment of error not well-taken.

**Fifth Assignment of Error**

{¶ 91} Petzke argues the cumulative effect of the errors noted above demonstrate that a fair trial was not had, and a reversal is required. She contends "the assertions,

29.

based as they were [on] inadmissible and unreliable evidence, . . . were not the fault of Katherine Petzke." She maintains "[t]here is no way that the jury could have kept their respective 'eyes on the ball' of the actual accusation, while they also needed to evaluate strained theories of guilt predicated upon dubious evidence." Petzke insists that "trying the case with a co-defendant who is -PARTIALLY- claiming a desperately weak self-defense claim virtually assured a conviction without the jury fairly evaluating the facts of the case as to Ms. Petzke." Petzke sets forth the law for cumulative error doctrine.

**Law and Analysis**

**{¶ 92}** The cumulative error doctrine provides:

> Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial.

*State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus.

**{¶ 93}** If no instances of error are found, the cumulative error doctrine does not apply. *State v. Leu,* 2019-Ohio-3404, ¶ 56 (6th Dist.), citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

**{¶ 94}** Upon review, having found that Petzke has not demonstrated any errors on appeal, we find the cumulative error doctrine does not apply. Accordingly, we find Petzke's fifth assignment of error is not well-taken.

30.

**{¶ 95}** The judgment of the Lucas County Court of Common Pleas is affirmed.

Petzke is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Myron C. Duhart, J.
CONCUR.

Gene A. Zmuda, J.
CONCURS IN JUDGMENT
ONLY.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.